IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

PARKERSBURG

KATHY V. DYE,

       Plaintiff,

v.                              Case No. 6:06-cv-00531

JOHN E. POTTER,
Postmaster General,
United States Postal Service,

       Defendant.

## PROPOSED FINDINGS AND RECOMMENDATION

This civil action is assigned to the Honorable Joseph R. Goodwin, United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).  Currently pending before the court is Defendant's Motion for Summary Judgment, filed November 2, 2007. (Docket # 26.)  Plaintiff responded on December 7, 2007 (# 29), and Defendant replied on January 7, 2008 (# 30), making the matter ripe for decision.

## PROCEDURAL HISTORY

Plaintiff filed her Complaint on June 26, 2006, against John E. Potter, Postmaster General of the United States Postal Service, under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), claiming workplace discrimination.  On October 12, 2006, Defendant filed a motion to dismiss Plaintiff's claims of gender

discrimination brought under Title VII because Plaintiff failed to exhaust her administrative remedies with respect to her claims of gender discrimination prior to filing the instant action.  (# 10.) Plaintiff responded (# 14), and the undersigned entered proposed findings and recommendation on May 23, 2007, recommending that the presiding District Judge dismiss Plaintiff's claims, including any gender discrimination claims, to the extent she failed to exhaust her administrative remedies (# 15, p. 10).  The court indicated only the claims stated in paragraphs 18, 21, 22, 23 and 24 of the Complaint remained.  Id.

On June 1, 2007, Plaintiff objected to the court's proposed findings and recommendation (# 16), and on June 12, 2007, the presiding District Judge adopted the proposed findings and recommendation and granted Defendant's motion to dismiss as set forth in the proposed findings and recommendation (# 17).

**RELEVANT ALLEGATIONS REMAINING IN THE COMPLAINT**

As noted in the court's proposed findings and recommendation adopted by the presiding District Judge, paragraphs 18, 21, 22, 23 and 24 of the Complaint remain.

In paragraph 18, Plaintiff claims that "[o]n September 11, 2003, [she] was given a letter of suspension claiming AWOL/Safe unlocked citing September 18-September 20 2003, allegations."[1]  (#

---

[1]  This paragraph also contains allegations of gender discrimination, which the court has omitted.

1, ¶ 18.)   Plaintiff asserts that the AWOL related to when she "asked for emergency leave to visit my sister who was suffering from leukemia.  I had just been notified she was being rushed into emergency surgery."  Id.

In paragraph 21, Plaintiff alleges that

[o]n October 15, 2003 [she] received a "Letter of Suspension" for "Improper Conduct/Failure to Follow Instruction". This happened after she received a call at 3:05 AM to come to work and she explained she was sleep deprived and could not.  Cynthia Walcutt would not accept the explanation and the Plaintiff said she would if Miss Walcutt would assume responsibility for Plaintiff's safety.  Miss Walcutt did not answer.  The call ended. Plaintiff's sleep cycle is unusually deep and she sleep walks.  Defendant used false evidence to persuade the arbitrator to suspend Plaintiff.  Also, when the decision came, it was found that Plaintiff was one of the last to know.  The truck driver said he knew the day before her.

Id. at ¶ 21.

In paragraph 22, Plaintiff alleges that on

November 20, 2003, [she] received a "Letter of Warning" for Express Mail mistakes although for one of the two charges, Cynthia Walcutt had assigned her to an enormous job at the last minute.  When the Plaintiff asked her for help, Postmaster Branner and Miss Walcutt denied her any.

Id. at ¶ 22.

In paragraph 23, Plaintiff further alleges that

[o]n December 24-25, 2003, [she] was subjected to disparate treatment regarding her work hours.  Jodi Conrad ordered the Plaintiff to stay late on Christmas Eve although she was scheduled to return at 1 am on Christmas Day.  Miss Conrad was advised by Mr. Sims of the Defendant's schedule by [sic], in Defendant's presence.  No other PTF was subjected to even similar hours. *** Also Mr. Sims claimed that Plaintiff "worked at the Main Office" on Christmas Eve.  This is not entirely true.  Plaintiff was at the Simmons Post Office

from 5:00 a.m. until about 1:30 p.m. before lunch.  After
lunch, she resumed work at the Main Office.  Mr. Sims was
at the Simmons office after about 7:00 a.m. until
Plaintiff left.

Id. at ¶ 23.[2]

Finally, in paragraph 24 Plaintiff alleges that

[o]n various dates from July through November 2003, [she]
was subjected to disparate treatment regarding work
schedule on weekend days. *** When she asked Mr. Sims, he
said, "Talk to Jodi."  Jodi is Jodi Conrad.  Plaintiff
would call Miss Conrad and she would always, except once,
say she was not going to change the schedule.  The
Saturday of the Columbus Day weekend 2003, after calling
Miss Conrad repeatedly, Plaintiff asked to see a union
representative.  Miss Conrad told her to leave work
immediately and leave anything unfinished lay.

Id. at ¶ 23.[3]

### RELEVANT FACTS DEVELOPED AT EEO ADMINISTRATIVE HEARING

Plaintiff claims in her Complaint that Defendant retaliated

against her because of two EEO complaints she filed in 1999 and

2000.  In 1999, Plaintiff alleged age discrimination against her

then supervisor, Tim Romine.  (Tr. at 47-48.)[4]  In 2000, Plaintiff

filed a second EEO complaint against her then supervisor, Ray

Leisure, alleging sexual harassment.  (Tr. at 50-52.)

At a hearing before an EEO Administrative Law Judge ("ALJ"),

---

[2]  This paragraph also contains allegations of gender discrimination, which
the court has omitted.

[3]  This paragraph also contains allegations of gender discrimination, which
the court has omitted.

[4]  The court will refer to the transcript from Plaintiff's EEO hearing as
"Tr. at ___."  The transcript is attached to Defendant's Motion for Summary
Judgment at docket # 26-2.

Lystra A. Harris, on February 2, 2006, the facts underlying the five (5) incidents set forth in her Complaint at paragraphs 18, 21, 22, 23 and 24, which form the basis of Plaintiff's retaliation claim, were developed in testimony from Plaintiff and Anthony DeMetro, Lyle Sims, Jodi Conrad Brown, and Dianna Morrison.

Paragraph 18 - AWOL and Unsecured Vault

Plaintiff worked for the postal service as a part-time flexible ("PTF") clerk on an as-needed basis. In that capacity, Plaintiff could be assigned to work at any one of five various stations. She could be called to work in a variety of positions, including window clerk and mail sorter or to check in mail carriers or account for certified and registered mail, among other duties. (Tr. at 112-15.) On Friday, July 18, 2003, shortly before 5:00 p.m., Plaintiff was working and received a phone call that her sister, who had leukemia and had been in a coma in a hospital in Cincinnati, Ohio, was rushed into emergency surgery for removal of her gall bladder. (Tr. at 13, 15.) Plaintiff told her supervisor, Jodi Conrad Brown, a Customer Service Supervisor at the Parkersburg, West Virginia post office, that she had to go see her sister. (Tr. at 14, 203.) Another supervisor, Diana Morrison, who was Supervisor of Customer Service at the Parkersburg, West Virginia post office, approved Plaintiff's leave for Saturday, July 19, 2003, and testified that Plaintiff did not request leave for Sunday, July 20, 2003. (Tr. at 276.) Plaintiff acknowledged she

5

was scheduled to work Saturday, July 19, 2003, and Sunday, July 20, 2003, and knew this on Friday when she made the request for time off on Saturday.  (Tr. at 19, 59.)  Plaintiff testified that she did not tell management when she would return to work.  (Tr. at 16, 61.)  Plaintiff returned from visiting her sister on Saturday, and acknowledged that she should have called in to say whether she could come to work the next day, Sunday, July 20, 2003, but did not.  (Tr. at 15-16.)  Plaintiff woke up late on Sunday, July 20, 2003, and felt that it was too late to call to report she was not coming into work, since she was supposed to report at 6:00 a.m. (Tr. at 17.)  She returned to work on Monday, July 21, 2003, when she was next scheduled to work.  (Tr. at 16.)

On July 18 and 19, 2003, Ms. Morrison was working and discovered around 2:00 a.m. on July 19, 2003, that the vault had been left open. (Tr. at 274-75.)  It was Plaintiff's responsibility to secure the vault at the end of her shift on July 18, 2003.  (Tr. at 276.)  Ms. Morrison reported this information to the immediate supervisor, Lyle Sims, who is the Manager of Customer Service at the Parkersburg post office.  (Tr. at 276, 108.)

Mr. Sims, through conversations with Ms. Morrison and at the direction of Ray Branner, the Parkersburg Postmaster, undertook a preliminary disciplinary investigation of the vault incident and Plaintiff's absence on Sunday, July 20, 2003.  Regarding the vault incident, Mr. Sims confirmed that it was Plaintiff who was

6

responsible for securing the vault that day.  In addition, when asked about the vault, Mr. Sims testified that Plaintiff "[s]aid when she left Friday that she was upset, and it was a very good possibility, because of her being upset, that she may have left it unlocked."  (Tr. at 131.)   At the hearing, Plaintiff disputed whether she had left the safe unlocked.  (Tr. at 17.)

Regarding her absence on Sunday, July 20, 2003, Mr. Sims testified that Plaintiff's absence from work was approved only for Saturday, not Sunday, and Plaintiff did not utilize an automated phone system to indicate she would not report for work on Sunday, July 20, 2003.  (Tr. at 125.)  Plaintiff stated to Mr. Sims that she "knew that she should have reported on Sunday, but that she was tired, of course, from driving out to Cincinnati and back, and had went to sleep and forgot to report in before 6 a.m.; and when she woke up, it was after 6 a.m.; so she just figured 'it's too late now,' you know, and there was no need to call in."  (Tr. at 128.)

On September 8, 2003, Mr. Sims issued a seven-day Notice of Suspension to Plaintiff citing her failure to call in to report her absence on Sunday, July 20, 2003, and her failure to secure the vault door on Friday, July 18, 2003.  (# 26-3, p. 40.)  Plaintiff grieved the Notice of Suspension, and in settlement of Plaintiff's grievance, the suspension was reduced to a Letter of Warning and all reference to Plaintiff having left the safe open was removed from the action.  (Tr. at 20-21; # 26-3, p. 40.)

<u>Paragraph 21 - Failure to Report</u>

On September 20, 2003, at 3:05 a.m., Plaintiff received a call from Cynthia Walcutt, Supervisor at the Parkersburg post office, requesting that Plaintiff report to work early.  (Tr. at 22, 122.) Plaintiff told Ms. Walcutt that she did not feel it was safe for her to come to work.  Plaintiff testified that she had difficulty falling asleep that night before Ms. Walcutt's call.  In addition, she lived in a construction zone.  Plaintiff testified that while she went to bed at 11:00 p.m., she was unable to sleep and "got up and wandered the house.  I sat on the couch, I read, I watched television.  I tried to lay back down.  I was up and down and up and down."  (Tr. at 22.)  Ms. Walcutt called when she had finally drifted off to sleep.  (Tr. at 22.)  Plaintiff testified that after she told Ms. Walcutt she did not feel it was safe for her to come into work, Ms. Walcutt told her to pull it together and come to work anyway.  (Tr. at 22.)  Plaintiff testified that she told Ms. Walcutt: "'If you want me to come, I'll come, but tell me that the Post Office and you will stand responsible if I wreck my car, if I get hurt,' and she didn't answer me."  (Tr. at 23.)  On October 10, 2003, Mr. Sims issued a seven-day Notice of Suspension to Plaintiff citing her failure to follow Ms. Walcutt's instructions to report to work and finding Plaintiff's explanation insufficient.  (# 26-3, pp. 44-45.)

Mr. Sims testified that he found Plaintiff's explanation about

why she could not report to work somewhat conflicting in that she had slept some.  In addition, he testified that Plaintiff lives no more than five miles away from work.  (Tr. at 139.)  Plaintiff grieved this suspension, which was upheld following an arbitration hearing.  (Tr. at 65, 145.)

Paragraph 22 - Express Mail

On November 3, 2003, Plaintiff was working with express mail and scanned it delivered three separate times.  On November 10, 2003, Plaintiff was working with express mail and failed to scan a piece of mail as having arrived.  (# 26-3, pp. 47-48.)

Regarding the November 3, 2003, incident, Plaintiff testified that

> [a]pparently, I scanned it incorrectly, and I meant to go and take those other scans out.  But with all the other things I had to do, I forgot to go back and take the two scans that I made that were incorrect, but they were delivered ... to the correct place.

(Tr. at 26.)  Plaintiff testified that she told Ms. Walcutt she had too much work and would need help, but was told to do her best and get the express mail out.  (Tr. at 24.)  Plaintiff also complained to Mr. Branner, who told her to do what she was told.  (Tr. at 24-25.)  Regarding the November 10, 2003, incident, Plaintiff testified that

> I would have to say either the machine failed or I just messed up. *** Probably, in my nervousness and trying to – – trying to do everything at once and make sure I don't forget all this stuff, I probably did mess that up.

(Tr. at 23-24.)

On November 20, 2003, Mr. Sims, based on information he received from Ms. Walcutt, issued a Letter of Warning for improper conduct/failure to follow instructions on November 3, 2003, and for unsatisfactory performance on November 10, 2003. (# 26-3, pp. 47-48, 147.) Mr. Sims testified that this was not the first time Plaintiff had encountered difficulties with certified mail. (Tr. at 150.) Mr. Sims could have issued a higher level of discipline, but chose not to. (Tr. at 154.)

Paragraph 23 - Christmas Holiday

On December 24, 2003, Claimant came in early, around 5:00 a.m., to help with "boxing." (Tr. at 26, 28.) At around 2:00 or 3:00 p.m., Ms. Conrad Brown placed a call, which was answered by Plaintiff. (Tr. at 212.) Ms. Conrad Brown requested that Plaintiff report to the express mail section to work on delivering express mail. (Tr. at 27.) Plaintiff reported to the express mail section and worked approximately four more hours or until 6:30 p.m. (Tr. at 71, 211.) Plaintiff was scheduled to work another shift at 1:00 a.m. on December 25, 2003. (Tr. at 27-29.) The facts are in dispute about whether Ms. Conrad Brown knew how long Plaintiff had been at work on December 24, 2003, or that Plaintiff had to work at 1:00 a.m. on December 25, 2003. (Tr. at 29, 70, 210.)

Paragraph 24 - Weekend Schedule

Plaintiff complained that she had to work more weekends than others in her same position. Plaintiff was one of five PTF clerks.

10

One PTF clerk, Tom Smith, had a medical condition that made it difficult for him to work on the weekends.  (Tr. at 31.)  Plaintiff testified that she was often scheduled to be off work on the weekend, but then the schedule would be changed, and she would be required to work more than the other five PTFs had to work on the weekends.  (Tr. at 31-32.)  Mr. Sims testified that he was responsible for the initial scheduling of the PTF clerks, but that this schedule was often changed at the main office by Mr. Branner or after the schedule was posted to accommodate for employee absences.  (Tr. at 155.)  Mr. Sims testified that he did not intentionally schedule Plaintiff for a significantly greater number of weekends than the other PTFs.  (Tr. at 156-57.)  Mr. Sims testified that there were a number of variables in setting the schedule, including the total number of hours per week that each employee had worked, vacation and sick leave and who had recently worked on a Saturday and Sunday.  (Tr. at 157.)  PTFs generally worked six days per week.  (Tr. at 158.)

Over a five month period from July through November of 2003, the five PTFs in Parkersburg worked on Saturdays and Sundays as follows:

|          | Saturday | Sunday |
|----------|----------|--------|
| Smith    | 8        | 3      |
| Bruner   | 18       | 18     |
| Shaffer  | 20       | 18     |
| DeMetro  | 15       | 9      |
| Plaintiff| 21       | 9      |

(Tr. at 237.)

11

ALJ Decision

By decision dated February 24, 2006, ALJ Harris issued a Bench Decision in which she found that Plaintiff had failed to establish a *prima facie* case of retaliation because there was no causal connection between Plaintiff's protected activity in 1999 and 2000, and the employment actions she complains of that occurred in 2003. (# 26-4, p. 15.)   Notwithstanding Plaintiff's failure to establish a *prima facie* case of retaliation, ALJ Harris further found that Defendant had presented legitimate, nondiscriminatory explanations for the Notices of Suspension, Letter of Warning, and the holiday and weekend work scheduling at issue in this matter.   (# 26-4, p. 17.)   Because Plaintiff had not shown that Defendant's legitimate, nondiscriminatory explanation was pretextual, ALJ Harris concluded that Defendant had not discriminated against Plaintiff based on the five areas identified above.   (# 26-4, pp. 24-25.)

## ARGUMENTS OF THE PARTIES

Defendant seeks an order awarding summary judgment because Plaintiff cannot demonstrate a *prima facie* case of reprisal discrimination with regard to the allegations remaining in the Complaint.   Defendant, citing caselaw, asserts that for the purpose of the instant Motion, Plaintiff has met the first two of three elements of a *prima facie* case of retaliation under Title VII; that she engaged in protected activity and that she suffered an adverse employment action.   Defendant concedes that Plaintiff engaged in

12

protected EEO activity in 1999 and 2000, prior to 2003 when the alleged discriminatory acts took place. In addition, Defendant "assumes *arguendo*, that the September 2003 Letter of Suspension (which was reduced by management to a Letter of Warning), the October 2003 Letter of Suspension, the November 2003 Letter of Warning, and the alleged disparate work schedules can all amount to adverse employment actions." (# 27, pp. 10-11.) Nevertheless, Defendant asserts that "Plaintiff fails to establish a *prima facie* case because she offers no evidence which establishes a causal connection between her protected activity in 1999 and 2000 and the alleged discriminatory actions which occurred in 2003." (# 27, p. 11.)

In the alternative, Defendant argues that even if Plaintiff has established a *prima facie* case of retaliation, Defendant has articulated legitimate, nondiscriminatory reasons for his actions, and Plaintiff cannot demonstrate those reasons are pretext for discrimination. (# 27, pp. 14-17.)

In response, Plaintiff disputes some of the statements made in Defendant's memorandum in support of his motion for summary judgment. (# 29.)

In reply, Defendant asserts that Plaintiff's response "relies primarily on minor discrepancies in the record presumably to establish a dispute of material fact." (# 30, p. 1.) Defendant asserts that Plaintiff "does not actually argue or establish that

13

these matters amount to disputes of material fact which would preclude summary judgment." (# 30, p. 1.) Defendant argues that "in her response Plaintiff implicitly admits to the underlying misconduct which supports Defendant's determination to issue the discipline which Plaintiff alleges was retaliatory." (# 30, pp. 1-2.)

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Pursuant to Rule 56(c), a district court must enter judgment against a party who, "after adequate time for discovery ... fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Stated differently, "[t]o prevail on a motion for summary judgment, [the moving party] must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) it is entitled to judgment as a matter of law." Harleysville Mut. Ins. Co. v. Packer, 60 F.3d 1116, 1119-20 (4th Cir. 1995) (citing Anderson v.

14

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).   In determining
whether a genuine issue of material fact has been raised, the court

> must construe all inferences in favor of the [nonmoving
> party].   If, however, the evidence is so one-sided that
> one party must prevail as a matter of law, we must affirm
> the grant of summary judgment in that party's favor.   The
> [nonmoving party] "cannot create a genuine issue of fact
> through mere speculation or the building of one inference
> upon another[.]"   To survive [the summary judgment]
> motion, the [nonmoving party] may not rest on their
> pleadings, but must demonstrate that specific, material
> facts exist that give rise to a genuine issue.   [T]he
> "mere existence of a scintilla of evidence in support of
> the plaintiff's position will be insufficient; there must
> be evidence on which the jury could reasonably find for
> the plaintiff[.]"

Harleysville, 60 F.3d at 1120 (citations omitted).   "Where the
record taken as a whole could not lead a rational trier of fact to
find for the non-moving party, there is no 'genuine issue for
trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp. 475 U.S.
574, 587 (1986) (citations omitted).

     "At bottom, the district court must determine whether the
party opposing the motion for summary judgment has presented
genuinely disputed facts which remain to be tried. If not, the
district court may resolve the legal questions between the parties
as a matter of law and enter judgment accordingly." Thompson
Everett, Inc. v. National Cable Adver., L.P., 57 F.3d 1317, 1323
(4th Cir. 1995).

## **ANALYSIS**

     To establish a *prima facie* case of retaliation in violation of
Title VII, 42 U.S.C. § 2000e-2, Plaintiff must satisfy the three-

step scheme set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S.

792, 802-04 (1973).  <u>Price v. Thompson</u>, 380 F.3d 209, 212 (4th Cir.

2004); <u>Laughlin v. Metropolitan Washington Airports Auth.</u>, 149 F.3d

253, 258 (4th Cir. 1998).  To establish a *prima facie* case of

retaliation,

> a plaintiff must prove three elements: (1) that she
> engaged in protected activity, (2) that an adverse
> employment action was taken against her, and (3) that
> there was a causal link between the protected activity
> and the adverse employment action.

<u>Laughlin</u>, 149 F.3d at 258 (citing <u>Hopkins v. Baltimore Gas & Elec.</u>

<u>Co.</u>, 77 F.3d 745, 754 (4th Cir.), <u>cert. denied</u>, 519 U.S. 818, 117

(1996)); <u>see also</u> <u>McDonnell Douglas</u>, 411 U.S. at 802.  Once the

plaintiff has established a *prima facie* case of retaliation, "the

burden shifts to the employer to establish a legitimate non-

retaliatory reason for the action.  If the employer sets forth a

legitimate, non-retaliatory explanation for the action, the

plaintiff then must show that the employer's proffered reasons are

pretextual or [her] claim will fail."  <u>Price</u>, 380 F.3d at 212.  A

plaintiff can prove pretext by "showing that [the employer's]

explanation is 'unworthy of credence' or by offering other forms of

circumstantial evidence sufficiently probative of [retaliation]."

<u>Mereish v. Walker</u>, 359 F.3d 330, 336 (4th Cir. 2004) (quoting <u>Texas</u>

<u>Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 256 (1981));

<u>Price</u>, 380 F.3d at 212.

16

*Prima Facie* Case

Defendant has conceded that Plaintiff established the first two of three elements required to show a *prima facie* case of retaliation; that Plaintiff engaged in protected EEO activity in 1999 and 2000, and that the various disciplinary actions and the disparate weekend and other work schedules amounted to adverse employment actions. Thus, the court turns to consideration of the third element, whether Plaintiff has shown a causal link between the protected activity and the adverse actions.

Temporal proximity between the protected activity and the adverse action is sufficient to show a causal connection for purposes of establishing a *prima facie* case of retaliation. Yashenko v. Harrah's NC Casino Co., LLC, 446 F.3d 541, 552 (4th Cir. 2006). In an unpublished decision, our Court of Appeals explained that "[w]e have not decided how close a temporal connection must exist for there to be a causal nexus, but our precedent establishes that several months is sufficiently proximate to satisfy the requirement." Brockman v. Snow, No. 06-1004, 2007 WL 493926, *4 (4th Cir. Feb. 13, 2007) (finding three months between involvement in an EEO complaint and denial of a request to work from home was sufficient to establish a causal connection (citing Williams v. Cerberonics, Inc., 871 F.2d 452, 454, 457 (4th Cir. 1989) (finding that the employee's filing of a discrimination complaint and termination approximately three months later was

sufficiently close to show a causal nexus)).  In comparison, in Parrott v. Cheney, 748 F. Supp. 312, 318 (D. Md. 1989), the court found that four months between the filing of an agency grievance and the adverse employment decision (plaintiff was not selected for a position) was insufficient to establish a causal connection, particularly when other job candidates had also filed grievances with the agency.

Similarly, in Joiner v. Wal-Mart Stores, Inc., 114 F. Supp.2d 400, 410 (W.D. N.C. 2000), the court found that "the period of six months between plaintiff's allegations and his termination" would not amount to close temporal proximity, particularly where, in the interim, plaintiff received favorable evaluations and promotions. In Tinsley v. First Union Nat'l Bank, 155 F.3d 435, 443 (4th Cir. 1998), the court found that "the period of fourteen years separating Plaintiff's filing of a charge of discrimination and her termination by the Bank is far too long a period of time to raise by itself an inference of retaliation."  In Tinsley, the court noted that the employer had "innumerable chances during the fourteen year period to retaliate against [the plaintiff] if it so desired," but instead, promoted plaintiff twice during those years. Id.

In short, "'[w]hile a causal nexus is inferred when the adverse employment action occurs shortly after participation in a protected activity,' such inference is not appropriate when the

time interval is too great." Cross v. Bally's Health & Tennis
Corp., 945 F. Supp. 883, 889 (D. Md. 1996) (two months between
plaintiff's complaint and termination constituted *prima facie*
evidence of retaliation (quoting Garrett v. Lujan, 799 F. Supp.
198, 202 (D.D.C. 1992) (passage of nearly a year between
plaintiff's complaint and adverse employment action was too great
to establish inference of reprisal)).

The court proposes that the presiding District Judge find that
Plaintiff has not established a causal connection between her EEO
activity in 1999 and 2000 and the alleged retaliatory actions by
Defendants in 2003. The passage of three to four years between the
protected activity and the alleged retaliatory actions is too great
to support an inference of reprisal. Moreover, there are other
undisputed facts which indicate a lack of causal connection between
the protected activity and the alleged retaliatory actions.

Plaintiff testified that a causal connection exists between
her EEO activity in 1999 and 2000 and the alleged retaliatory
actions in 2003, based on certain personal relationships between
and among her supervisors, Mr. Sims, Ms. Morrison and Ms. Conrad
Brown and Mr. Romine and Mr. Leisure, the individuals against whom
Plaintiff filed the EEO complaints. In addition, Plaintiff
testified that she had a falling out with Ms. Walcutt and, as a
result, "she would do anything to help management against me."
(Tr. at 33.)

Plaintiff did not call Ms. Walcutt to testify at the administrative hearing, and has not otherwise offered evidence to prove that Ms. Walcutt's animus towards Plaintiff led her to retaliate against Plaintiff because Plaintiff engaged in EEO activity in 2000 and 2001.

Plaintiff testified that Mr. Romine was friends with Ms. Morrison and Ms. Conrad Brown. Plaintiff testified that Mr. Romine was transferred in 2002, that Ms. Morrison and Ms. Conrad Brown were upset with her because of the transfer, and that the retaliatory actions started after the transfer. (Tr. at 34.) Plaintiff further testified that she believed both Ms. Morrison and Ms. Conrad Brown had personal relationships with Mr. Romine. (Tr. at 53-55.)

Ms. Morrison testified that she was friends with both Mr. Romine and Mr. Leisure, that she attended a Christmas party at Mr. Romine's house and traveled out of town with him for postal meetings. (Tr. at 289-90.) Ms. Morrison testified that when she began working in Parkersburg in 1999, there was an EEO in progress (against Mr. Romine), but she was not involved in it and at the time, did not know what it was about. (Tr. at 277.) Ms. Morrison was involved in investigating Plaintiff's EEO complaint against Mr. Leisure. (Tr. at 283.)

Ms. Morrison's involvement in the instant action is limited to approving Plaintiff's leave for Saturday, July 19, 2003 (Tr. at

20

276) and reporting to Mr. Sims that the vault had been left open (Tr. at 276, 108).    Ms. Morrison did not issue any of the disciplinary actions against Plaintiff related to these two incidents, and the court cannot ascertain how any personal relationship between Ms. Morrison and Mr. Romine or Ms. Morrison and Mr. Leisure establishes the causal connection between Plaintiff's EEO activity and the alleged retaliatory actions, particularly given the substantial passage of time between Plaintiff's EEO activity in 1999 and 2000, and this alleged retaliatory action in 2003.

Ms. Conrad Brown confirmed she had dated Mr. Romine in 1989. (Tr. at 220.)  Ms. Conrad Brown testified that in 2003, she did not know that Plaintiff had engaged in EEO activity against Mr. Romine or Mr. Leisure.  (Tr. at 213-14.)  Plaintiff told Ms. Conrad Brown in late 2003 or early 2004, about her EEO complaint against Mr. Leisure.  (Tr. at 212-13.)  Ms. Conrad Brown testified that her request that Plaintiff work with express mail on December 24, 2003, the only allegation of retaliation related to Ms. Conrad Brown, had nothing to do with her knowledge that Plaintiff had filed an EEO complaint against Mr. Leisure. (Tr. at 216.)  Notably, Ms. Conrad Brown did not know who would answer the phone when she sought additional help on December 24, 2003.   (Tr. at 208-10.) Plaintiff's assertions of a casual connection between her EEO activity and the alleged actions at issue in this matter based on

Ms. Conrad Brown's dating relationship with Mr. Romine in 1989 and her knowledge and Plaintiff's EEO complaint against Mr. leisure are not convincing.

Turning to Mr. Sims, prior to disciplining Plaintiff in 2003, he knew of Plaintiff's EEO activity against Mr. Leisure, but he did not know of her EEO activity against Mr. Romine.  (Tr. at 135.) Mr. Sims never discussed the nature of the complaint with Mr. Leisure, and he was unaware as to the outcome of the EEO complaint. (Tr. at 137.)  Mr. Sims had a business relationship with Mr. Leisure and socialized outside of work with Mr. Leisure on a couple of occasions.  (Tr. at 137.)  Again, the court cannot conclude that any relationship between Mr. Sims and Mr. Leisure is sufficient to establish a causal connection between Plaintiff's EEO activity and the alleged retaliatory actions, particularly given the substantial passage of time between the EEO activity and the alleged actions. In addition, Mr. Sims did not know of Plaintiff's EEO activity against Mr. Romine.  Furthermore, as discussed further below, Mr. Sims' reasons for disciplining Plaintiff are legitimate and not retaliatory, and Plaintiff has not shown Defendant's reasons were pretextual.

Based on the above, the court proposes that the presiding District Judge find that Plaintiff has not established a *prima facie* case of retaliation because Plaintiff has not shown a causal connection between her EEO activity in 1999 and 2000, and the

alleged retaliatory actions in 2003.

Legitimate Nonretaliatory Reasons/Pretext

Although the court has proposed that the presiding District Judge find that Plaintiff has not established a *prima facie* case of retaliation, the court will proceed to the next step of the analysis.  The court will assume for purposes of argument that Plaintiff established a *prima facie* case of retaliation, and will next make a recommendation about whether Defendant has met his burden of establishing a legitimate, nonretaliatory reason for the various actions at issue and whether Plaintiff has shown that these reasons are pretextual.

Defendant asserts that as to the September 8, 2003, Notice of Suspension (AWOL/Unsecured Vault), which was later reduced to a Letter of Warning with omission of all reference to the safe issue, the October 10, 2003 Notice of Suspension (Failure to Report), which was upheld following arbitration, and the November 20, 2003 (Express Mail/Express Mail) Letter of Warning, his reasons for these actions are detailed in the notices themselves and Plaintiff generally does not dispute the facts that underlie them. (# 27, p. 14.)

The court proposes that the presiding District Judge find that Defendant met his burden of establishing legitimate, nonretaliatory reasons for the various disciplinary actions and other actions at issue in this matter.  Regarding the September 8, 2003, Notice of

23

Suspension, Plaintiff was disciplined for her failure to report to work on Sunday, July 20, 2003, and to secure a vault door. In the Notice, Mr. Sims stated that in his predisciplinary interview, Plaintiff

> thought it was understood the time off was indefinite. However, Supervisor Diana Morrison stated that, when she verbally approved your leave for Saturday, it was made clear you requested only Saturday and she approved only Saturday. I find this and your other answers to be insufficient to relieve you of your responsibility to maintain your assigned schedule and to avoid unscheduled absences/AWOL.

(# 26-3, p. 40.) As to the unsecured vault door, Mr. Sims stated that in the predisciplinary interview, Plaintiff stated she "remembered closing the vault door, but admit[ted] to possibly not locking the door/spinning the dial for the combination to engage the lock." (# 26-3, p. 41.)

The evidence is undisputed that Plaintiff failed to report to work on Sunday, July 20, 2003, or to call in to report she would be unable to work. Plaintiff acknowledged that she was scheduled to work on Sunday, July 20, 2003, and knew this on Friday, July 18, 2003, when she made the request for time off on Saturday, July 19, 2003. (Tr. at 19, 59.) In addition, she testified that she did not call in to state she would not report to work on July 20, 2003, because she woke up too late on the morning of July 20, 2003, to call in. (Tr. at 17.) While Plaintiff more recently disputes whether she actually left the vault unsecured, at the time Plaintiff was disciplined she told Mr. Sims that she may not have

24

locked the door and spun the dial.   (# 26-3, p. 41.)   Mr. Sims
acted on the basis of Plaintiff's admission at the time of the
incident.   The reasons proffered by Defendant for disciplining
Plaintiff on September 8, 2003, related to her failure to report to
work on Sunday, July 20, 2003, and for her failure to secure the
vault are legitimate and nonretaliatory, and the court proposes
that the presiding District Judge so find.

Regarding Defendant's October 10, 2003, Notice of Suspension
related to Plaintiff's failure to follow instructions and report to
work on September 20, 2003, Defendant's Notice states that
Plaintiff told Ms. Walcutt she "had been in bed for two hours,
could not focus and would be unsafe to drive.  You went on to state
that you had not expected to be called to report early."  (# 26-3,
p. 44.)   Mr. Sims found Plaintiff's "answers insufficient to
substantiate your failure to follow instructions" and in direct
conflict with portions of the employee manual requiring employees
to obey instructions of their supervisors.   (# 26-3, p. 44.)   At
the hearing, Mr. Sims further testified that he found Plaintiff's
explanation about why she could not report to work somewhat
conflicting in that she had slept some.   In addition, he testified
that Plaintiff lives no more than five miles away from work.   (Tr.
at 139.)   Defendant disciplined Plaintiff because she failed to
report to work following a request from her supervisor.   Again,
Defendant has established legitimate, nonretaliatory reasons for

this discipline, and the court proposes that the presiding District Judge so find.

Plaintiff received the November 20, 2003, Letter of Warning based on improper conduct and unsatisfactory performance related to express mail errors on two occasions. Mr. Sims indicated in the Letter of Warning that on November 10, 2003, Plaintiff failed to scan express mail as instructed. Mr. Sims stated that "[y]ou have demonstrated in the past that you know the correct scanning procedures for Express Mail items. Therefore, I find your failure to follow my instructions to be unacceptable and without excuse." (# 26-3, p. 47.) On November 3, 2003, Mr. Sims stated that Plaintiff scanned a piece of express mail three times and failed to scan the express mail as noted in the first charge. Mr. Sims again stated that Plaintiff has "demonstrated in the past that you know the correct scanning procedures for Express Mail items however; you failed to correctly perform this task." (# 26-3, pp. 47-48.) Mr. Sims refers to the employee and labor relations manual sections dealing with obeying orders and performing job duties conscientiously and effectively. (# 26-3, p. 48.)

Plaintiff does not dispute that she made the mistakes that formed the basis of Mr. Sims' November 20, 2003, Letter of Warning. Regarding the November 3, 2003, incident, Plaintiff testified that

> [a]pparently, I scanned it incorrectly, and I meant to go
> and take those other scans out. But with all the other
> things I had to do, I forgot to go back and take the two
> scans that I made that were incorrect, but they were

26

delivered ... to the correct place.

(Tr. at 26.)  Regarding the November 10, 2003, incident, Plaintiff testified that

> I would have to say either the machine failed or I just messed up. *** Probably, in my nervousness and trying to - - trying to do everything at once and make sure I don't forget all this stuff, I probably did mess that up.

(Tr. at 23-24.)

Furthermore, Mr. Sims testified that Plaintiff made "more mistakes than any clerk I have.  Clerks that I have had discussions with and even "Letter of Warning" with Express Mail items, never - -has not to this date made another mistake."  (# 26-3, p. 197.)

Defendant's explanation is legitimate and reflects this disciplinary action was taken because Plaintiff did not perform her job properly despite being trained, admitted she had made the mistakes and had made other mistakes in the past.  Thus, the court proposes that the presiding District Judge find that Defendant has established legitimate, nonretaliatory reasons for this discipline.

Regarding Plaintiff's complaints about working extended hours on December 24, 2003, and working on more weekends than other PTFs, Defendant states in his response that Plaintiff's schedule was not set and that the very purpose of the PTF workforce is to schedule employees when they are needed.  Defendant points out that Plaintiff was not the only employee called out to work on Christmas Eve, as Mr. DeMetro was also required to work on express mail. (# 27, p. 14; Tr. at 70.)  In addition, compared to the other four PTF

clerks, Plaintiff worked more Saturdays, but fewer Sundays than the others.   Plaintiff worked a total of 30 Saturdays and Sundays combined, while other employees worked as many as 38 Saturdays and Sundays combined.  (# 27, p. 14; Tr. at 237.)

The court proposes that the presiding District Judge find that Defendant has established legitimate, nonretaliatory reasons for Plaintiff's work schedules.  Regarding Plaintiff's assertions that she was required to work extra on the Christmas holiday and over weekends when other similarly situated employees were not, Plaintiff was not the only PTF called out to work extra on December 24, 2003.  Mr. DeMetro was also required to work on Express Mail. (Tr. at 70.)  Notably, when Ms. Conrad Brown called to secure more help on December 24, 2003, she did not know Plaintiff would answer the phone.  Finally, the very nature of Plaintiff's position, as a *part-time flexible* clerk, indicates Plaintiff's help may have been required in situations such as this one during a busy holiday season.

With respect to Plaintiff's complaint that she worked more weekends than others in her position, the undisputed evidence of record indicates that while Plaintiff worked more Saturdays than any other employee, she worked far fewer Sundays than most of the remaining PTF clerks.  Plaintiff certainly did not work as many Saturdays and Sundays combined as at least two of the other PTF clerks.

28

Based on the above, the court proposes that the presiding District Judge find that Defendant has met his burden of establishing legitimate, nonretaliatory reasons for the disciplinary and other actions about which Plaintiff complains.

The court further proposes that the presiding District Judge find that Plaintiff has not proven pretext by showing that Defendant's explanations are unbelievable or by offering other forms of circumstantial evidence of retaliation. Mereish v. Walker, 359 F.3d at 336. As discussed above, the court found unconvincing, Plaintiff's assertions of a causal connection between her protected activity and the various disciplinary and other actions based on a series of personal relationships among and between her supervisors who took the actions and the supervisors against whom she had filed EEO complaints. For those same reasons, the court proposes that the presiding District Judge find that Plaintiff has not shown that the existence of these relationships dictates a finding that Defendant's proffered reasons are pretext for retaliation.

Plaintiff makes other arguments that are equally unpersuasive. Plaintiff attempts to argue evidence of retaliation on the basis that other similarly situated employees were not treated the same as Plaintiff. For example, in her response, Plaintiff asserts that other regular clerks left an office door unlocked overnight and left express mail at the wrong business address, but were not

disciplined.  (# 29, p. 4.)  Even if true, it appears these employees were not PTF clerks and, as such, were not similarly situated to Plaintiff, a PTF clerk.

Plaintiff's assertions that she was treated differently than other similarly situated employees are not supported by the evidence of record.  As our Court of Appeals has stated, "[a] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action." Williams, 871 F.2d at 456.

In addition, Plaintiff's response suggests there are disputed facts, though Plaintiff does not indicate how such facts are material.  In particular, Plaintiff points out that while she first approached Ms. Conrad Brown about her need to be off work because of her sister's illness, in her Affidavit, Ms. Conrad Brown denied involvement in the September 8, 2003, Notice of Suspension related to Plaintiff's failure to report for work on Sunday, July 20, 2003. (# 29, pp. 2, 8-9.)  The court credited Plaintiff's testimony that she first approached Ms. Conrad Brown about obtaining leave. However, it is undisputed that Ms. Conrad Brown was not involved in approving Plaintiff's leave, Ms. Morrison approved it.  Nor did Ms. Conrad Brown issue the Notice of Suspension.  As such, this is not a material fact in dispute.

Plaintiff argues that Defendant failed to mention in his account of the vault incident that while Ms. Morrison reported the vault was left unsecured, Ms. Morrison asserted in an Affidavit that she was not involved in the September 8, 2003, Letter of Suspension. (# 29, pp. 2, 10-11.)  The evidence of record as recited above indicates Ms. Morrison's involvement in the vault incident.  Again, the court cannot glean how Ms. Morrison's statement in the Affidavit would create a disputed material fact. At the time Defendant issued the discipline related to the vault incident, Plaintiff acknowledged that she may have left the vault unsecured.  Defendant has established a legitimate and nonretaliatory reason for disciplining Plaintiff regarding the vault incident.

With respect to the October 10, 2003, Notice of Suspension regarding Plaintiff's failure to report to work, Plaintiff attempts to explain in her response, the reasons as to why her explanation about her inability to come to work may have seemed inconsistent. Plaintiff asserts that

> [t]he contradictions in Mrs. Dye's answers when Mr. Sims and Ms. Walcutt questioned her were not as a result of dishonesty on her part but caused by ineffective questioning by management.  They asked how long she had been asleep.  She said, "About two hours."  Then when asked what time she went to bed[,] [s]he said, "Around 11 p.m."  No one asked about the time difference.  Mrs. Dye is not in the habit of lying so if they wanted more information than that, they should have asked for it.

(# 29, p. 3.)

31

Despite Plaintiff's testimony about why she could not report to work on September 20, 2003, Plaintiff does not dispute that she failed to report to work.

Regarding the November 20, 2003, Letter of Warning related to Plaintiff's failure to handle express mail properly, Plaintiff asserts that "management went out of their way to put Plaintiff in a situation that would likely trip her up." (# 29, p. 3.) Plaintiff asserts she was assigned more work than she could handle. (# 29, p. 3.) Plaintiff does not offer evidence in support of this assertion. What the undisputed evidence of record does reveal, is that Plaintiff admitted she did make the mistakes referred to in the Letter of Warning. (Tr. at 23-24, 26.)

With respect to Plaintiff's complaint that she had to work an extended shift on December 24, 2003, until 6:30 p.m. and return the next morning at 1:00 a.m., Plaintiff acknowledges that the Christmas season is the busiest time of year. (# 29, p. 5.) While Plaintiff states that she did not tell Ms. Conrad Brown how long she had been working or that she had to be back at work the next day, Plaintiff asserts that Mr. Sims knew this information, and that Mr. Sims repeated it to Ms. Conrad Brown. Plaintiff asserts that Ms. Conrad Brown stated that giving Plaintiff eight hours rest between shifts was not required by the contract. Plaintiff points out that she had to work more than Mr. DeMetro, who had also been called in to work. (# 29, p. 5.)

Again, Plaintiff has not provided evidence that other employees worked better schedules or fewer hours than she did around the Christmas holiday. Mr. DeMetro testified that he had worked each of the five Christmas seasons he was employed as a PTF. (Tr. at 104.) Plaintiff's position as a PTF employee is, by its very nature, unpredictable. It would not be unreasonable for Plaintiff to expect to be called into work during the busiest mailing season of the year. Plaintiff simply has not provided evidence as to how her work schedule around the Christmas holiday was *prima facie* evidence of retaliation or how Defendant's explanation as to why Plaintiff had to work over the holiday was pretextual.

Plaintiff asserts that there are discrepancies in when Ms. Conrad Brown claims that she knew of Plaintiff's EEO activity. The undisputed evidence reveals that Ms. Conrad Brown knew of Plaintiff's EEO activity before the December 24, 2003, incident in which Ms. Conrad Brown was involved. Thus, the timing of exactly when Ms. Conrad Brown knew of Plaintiff's EEO activity is not material. Besides, as noted above, Ms. Conrad Brown did not know who would answer the phone when she sought help with express mail on December 24, 2003. (Tr. at 208-10.)

Finally, Plaintiff suggests she was treated differently than her male counterparts. Plaintiff argues in her response that "[t]he men referred to in this complaint were repeatedly treated to

33

favorable hours and mistake forgiveness.  The Plaintiff was abused at every turn, even disciplined for taking a lunch." (# 29, p. 6.) Plaintiff's claims before the court are not based on sexual harassment.  As the court has indicated before, Plaintiff has not exhausted her administrative issues regarding complaints of sexual harassment.  Instead, the issue before the court is whether Defendant retaliated against Plaintiff for making EEO complaints. As discussed herein, the undisputed evidence of record indicates that Plaintiff has not made out a *prima facie* case of retaliation. Even assuming Plaintiff established a *prima facie* case of retaliation, Defendant has established legitimate, nonretaliatory reasons for the disciplinary and other actions, and Plaintiff has not shown pretext.

Thus, the undersigned proposes that the presiding District Judge **FIND** that Plaintiff has not made out a *prima facie* case of discrimination and, even if she had, Defendant has established legitimate, nonretaliatory reasons for the disciplinary and other actions and Plaintiff has not shown these reasons are pretextual.

Accordingly, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** Defendant's Motion for Summary Judgment and dismiss this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, Chief Judge.  Pursuant to the

34

provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have ten days (filing of objections), and then three days (service/mailing), from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the district court and a waiver of appellate review by the circuit court of appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Chief Judge Goodwin, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to Plaintiff and counsel of record.

August 14, 2008
Date

Mary E. Stanley
United States Magistrate Judge

35